IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ROBERT G. WING, as Receiver for VESCOR CAPITAL CORP., a Nevada Corporation, et al.,<br><br>Plaintiff,<br><br>vs.<br><br>DWIGHT B. WILLIAMS aka DWIGHT B. WILLIAMS & ASSOCIATES, an individual,<br><br>Defendant. | FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER<br><br><br><br>Case No. 2:09-CV-399<br><br>Judge Dee Benson |

This matter was heard by the court in a bench trial held on December 6-7, 2010. Plaintiff Robert W. Wing, in his capacity as Receiver for VesCor Capital Corporation ("VesCor"), was represented by M. David Eckersley. Defendant Dwight B. Williams was represented by Alan L. Smith. Mr. Wing, as Receiver for VesCor, has sued Mr. Williams under the Uniform Fraudulent Transfer Act (UFTA), maintaining that Williams provided legal services to companies that were part of a Ponzi scheme and therefore the payments to Williams for services rendered were "fraudulent transfers" which are recoverable for the benefit of the investors who were victimized

by that scheme. Williams contends that, even if the payments were fraudulent because they came from a Ponzi operation, he has a defense to the otherwise fraudulent transfers because he accepted the transfers in good faith and for a reasonably equivalent value.[1]

The court heard the testimony of both fact and expert witnesses, received into evidence several exhibits, and heard the arguments of counsel for the parties. Having considered all of the evidence presented, the court enters the following Findings of Facts, Conclusions of Law and Order.

## **FACTUAL BACKGROUND & FINDINGS**

Defendant Dwight B. Williams is an attorney who has been practicing law since the late 1960s. (Tr. at 160.) He practices in the areas of international business and corporate finance, which includes securities law compliance. (Tr. at 160-61.) Williams has never practiced in the areas of insolvency law, bankruptcy law or creditors' rights. (Tr. at 162.) Similarly, Williams has never worked as an accountant and has no accounting expertise. (Tr. at 176-78.)

In the mid-1990s[2] and then again in the early 2000s, Williams represented several

---

[1] Prior to trial, the court and parties agreed that the bench trial would be limited to these two issues: whether the VesCor affiliated companies were part of a Ponzi scheme, rendering the payments to Williams "fraudulent transfers," and if so, whether Williams could establish an affirmative defense to the fraudulent transfers because he received the payments in good faith and for reasonably equivalent value. Given the narrow issues agreed upon for trial, the arguments in Williams' post-trial memorandum concerning standing, the statute of limitations and other such defenses are improper. Moreover, the court has previously addressed and rejected these arguments. See Wing v. Dockstader, Slip Copy, 2010 WL 5020959 (D. Utah Dec. 3, 2010); Wing v. Hammons, Slip Copy, 2009 WL 1362389 (D. Utah May 14, 2009); Wing v. Kendrick, Slip Copy 2009 WL 1362383 (D. Utah May 14, 2009).

[2] In 1994, Williams prepared two private placement memoranda for VesCor. (Tr. at 162.) Although Williams' representation of VesCor during the mid-1990s is outside the relevant time

companies which were affiliated with VesCor. For purposes of this case, however, the relevant time period runs from late November 2001 through May 2004. During this relevant time period, Williams represented approximately six VesCor companies in the preparation of limited offering memoranda. (Tr. at 162-63.) As a general matter, Williams' role as counsel for these companies was to bring them into compliance with federal and state securities laws so they could proceed, with regulatory approval, to raise capital for specific ventures. Additionally, by means of so-called recission offers, it was Williams' job to make sure that the offering materials he prepared "sanitized" earlier offerings which had not satisfied the registration and exemption requirements of federal law. (Tr. at 167.)

As demonstrated by Williams' retention agreements with the VesCor entities, the scope of Williams' representation was confined to these securities regulation or litigation related matters. (Def.'s Ex. C & V.) Consistent with this limited representation, Williams did not give accounting advice to the VesCor entities he represented. Moreover, Williams testified that, when dealing with Blue Sky Commissioners concerning the regulatory approval of limited offerings, if there were questions about financial statements or accounting procedures, the accounting staffs at those Commissions dealt with VesCor accountants, not Williams. (Tr. at 176-78, 191, 209-13.)

Williams always worked as outside counsel for VesCor. He was never a director, officer,

---

period for purposes of this lawsuit, Williams did become aware during that time that both the Nevada and Utah Securities Divisions were looking into VesCor for non-compliance issues. (Tr. at 26-30.) And, years later Williams also became aware that a private placement memorandum he prepared during that time was found to have contained a material misstatement of fact based on the purported financial statements of VesCor.

manager, employee or investor with any VesCor entity. (Tr. at 163-64.) He had no social relations with Val Southwick or any principal of the VesCor companies. (Tr. at 164.)

When Williams began his work for VesCor in late November of 2001, Williams believed that VesCor had only six companies with realty projects that required securities law compliance. (Tr. at 165-67.) Williams' belief in this regard was based on that fact that these six projects were the only projects about which the Utah Securities Commission had complained in terms of non-compliance. (Tr. at 192-93.) Williams was not aware of any other VesCor related entity that had been or might have been selling unregistered securities. (Tr. at 193.) Although Williams was aware that VesCor was not in compliance with the securities laws, because the Securities Commission responded to VesCor's non-compliance by entering into negotiations for their correction rather than shutting VesCor down, Williams assumed that the compliance issues were redressable.

While working on these various projects for VesCor, Williams visited each of the properties in question or saw documentation, such as trust deeds or rent rolls, which authenticated their existence and substance. Accordingly, Williams believed that each of the projects were real, viable enterprises. (Tr. at 167.)

Williams also acknowledged that when he began working for VesCor in late 2001, trying to get the VesCor entities in compliance, he was aware that the Utah Securities Commission was "upset" with Southwick because he had "violated two previous consent decrees." (Tr. at 170, 197.) As previously stated, Williams was aware of the prior non-compliance, but had received an explanation which he credited. (Tr. at 180-81 & Def.'s Ex. J.) According to Williams,

because of Southwick's history, the Utah Securities Commission put VesCor "under the microscope," giving it close "scrutiny," and the negotiations to achieve compliance were correspondingly "tough." (Tr. at 169-70, 197-98; Def.'s Ex. P.)

The negotiations with the Utah Securities Commission included a review of the financial condition of the various VesCor companies. The financial statements prepared by the VesCor accountants and shown to Williams reflected a substantial net worth. Nonetheless, at the insistence of the Commission, the financial statements were reviewed by a separate and independent accounting firm, which likewise concluded that VesCor was solvent. (Tr. at 170-80.)

Williams, a non-accountant, relied upon the work of these two separate accounting firms in processing the financial disclosures that were required for the securities offering materials. Williams had no reason to question their work. (Tr. at 178-79.) Williams also relied on the accounting staffs at the Blue Sky Commissions. Given the adversarial relationship between the Blue Sky Commissions and VesCor over previous non-compliance issues, Williams reasonably believed that the accounting staffs at the Blue Sky Commissions were subjecting Southwick and VesCor to an extra close review. During this period of time, none of the participants, which included the independent auditors as well as the Commission and its staff, ever suggested that any of the VesCor companies were part of a Ponzi-type scheme. (Tr. at 195-96.)

At the end of 2002 and through 2003, after completing his work on the six projects noted above, Williams also did corporate work which included the review of financing and real estate documentation for a VesCor project known as North Silver Lake Lodge. In addition, Williams'

office provided litigation support services to Alan Sullivan and the law firm of Snell & Wilmer, the attorneys who were representing VesCor's interests in litigation over the North Silver Lake Lodge project. (Tr. at 200-01.)

In 2003 and 2004 Williams worked on other offering memoranda for additional VesCor entities, but his work on these projects became grid-locked in negotiations with the Utah Securities Commission over integration aspects of the exemption compliance under SEC Regulation D. (Tr. at 216-20.) As before, the Commission was willing to negotiate over the compliance issues and did not shut down the VesCor enterprises. Williams testified that although the negotiations with the Commission reflected various compliance concerns, once again, no one at the Securities Commission ever said or did anything to suggest that VesCor was a Ponzi-type operation. (Tr. at 229.)

These integration negotiations with the Commission ultimately resulted in an impasse which frustrated Southwick. Williams testified that Southwick felt as though Williams did not have enough "political clout," and that Williams' lack of clout rendered him ineffective in negotiating a solution with the Commission. (Tr. at 220.) As a consequence, in May of 2004 Williams parted ways with VesCor. From November of 2001 through May 2004, VesCor paid Williams a total of $379,545.

On February 6, 2008, the United States Securities and Exchange Commission (SEC) filed suit against Southwick and VesCor, alleging violations of the Securities Act of 1933 and the Securities and Exchange Act of 1934. This court appointed Robert G. Wing as Receiver for VesCor on May 5, 2008. The Receiver filed this ancillary case against Mr. Williams on May 4,

2009, alleging that the $379,545 paid by VesCor to Williams was a fraudulent transfer. (Dkt. No. 2.)

The Receiver's theory of fraudulent transfer relies on the Ponzi scheme doctrine which provides that the existence of a Ponzi scheme is sufficient to establish actual intent to defraud. See <u>Scholes v. Lehmann</u>, 56 F.3d 750 (7th Cir. 1995). To invoke the Ponzi scheme doctrine, the Receiver provided testimony from an expert witness, Gil Miller, a forensic accountant, hired by the Receiver to investigate VesCor's financial and business records. (Tr. at 86.) The receiver also relied on the testimony of Monique Fisher, a former VesCor employee and insider.

The Receiver's expert, Mr. Miller, determined that "the characteristics of a ponzi scheme existed from at least the year 2000." (Tr. at 126.) Mr. Miller testified that "new investor money was being used to pay old investors" and "money was comingled." (Tr. at 116.) Miller further explained that "there was a shifting of investors from one project to another in terms of their monies. If one project needed monies more than another, then [Southwick] would shift those investors to those projects." (Tr. at 117.) Mr. Miller testified that:

> the vast majority of sources of cash were from investor deposits. Then if you look at where did all the cash go, you'll see that by and large most of it went to pay investor payments. Again, as was the case in almost every year that we analyzed, approximately 70 percent in most years of the investor money that came in went straight back out to pay old investors their returns.

(Tr. at 126, 127-30.)

The receiver also put forth testimony from former VesCor employee Monique Fisher to establish that the VesCor entities were all part of Mr. Southwick's scheme. Ms. Fisher, controller for VesCor, testified that VesCor commingled investor money. According to Ms.

Fisher, when there wasn't enough money in one account to satisfy one entities' obligations, Mr. Southwick would transfer money between accounts in order to meet VesCor's obligations. (Tr. at 14-15.) In addition, Ms. Fisher testified that new investor money was routinely used to pay old investors. (Tr. at 20).

In sum, the Receiver's witnesses and exhibits provided evidence that investor funds were commingled, new investor funds were used to pay old investors, and no VesCor project ever produced any net income. (Tr. at 14-15, 20, 122-23.) Mr. Williams offered no evidence to the contrary.

## **LEGAL CONCLUSIONS**

The Receiver in this case has established that, from at least the year 2000 forward, Val Southwick operated VesCor as a Ponzi scheme. The testimony of Monique Fisher and Gil Miller demonstrated that investor funds were co-mingled, that new investor funds were used to pay old investors, and no VesCor projects produced any net income. Having concluded that the Receiver has established that VesCor operated as a Ponzi scheme, the Ponzi scheme presumption applies, and the receiver has effectively established actual intent to defraud with respect to every transfer from VesCor to Mr. Williams.

As stated previously by this court, "[u]nder the [Uniform Fraudulent Transfer Act], a debtor's actual intent to hinder, delay or defraud is conclusively established by proving that the debtor operated as a Ponzi scheme." Wing v. Dockstader, Slip Copy, 2010 WL 5020959 at *4 (D. Utah Dec. 3, 2010). Therefore, the Funds paid by VesCor to Mr. Williams for legal services or expenses from November 2001 through May 2004 were fraudulent transfers because they

were made at a time when VesCor was being operated as a Ponzi scheme or was insolvent.

Having so concluded, the court next answers the question of whether Mr. Williams has established an affirmative defense to the fraudulent transfers. The Uniform Fraudulent Transfer Act provides an affirmative defense to an otherwise fraudulent transfer if the transferee accepted the transfer in good faith and for a reasonably equivalent value. Utah Code Ann. § 25-6-9(1). There appears to be no dispute in this case that Williams provided reasonably equivalent value for the services he rendered and the costs he incurred in connection with his representation of the VesCor companies for the period in question. Accordingly, the only issue is whether Williams qualifies as a good faith transferee under the UFTA.

To determine whether Williams qualifies as a good faith transferee, the court relies on the United States Court of Appeals for the Tenth Circuit's opinion in Jobin v. McKay, 84 F.3d 1330, 1336 (10th Cir. 1996). In Jobin, the Tenth Circuit stated: "A transferee who reasonably should have known of a debtor's insolvency or of the fraudulent intent underlying the transfer is not entitled to a finding of good faith." Id. at 1338. The Jobin court further explained that "good faith . . . should be measured objectively and that 'if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a *diligent* inquiry would have discovered the fraudulent purpose, then the transfer is fraudulent." Id. at 1338.

Considering all of the relevant facts, the court finds that Williams has satisfied his burden of proving by a preponderance of the evidence that he received payment in good faith. The evidence showed that Williams was a securities lawyer, working with a client to comply with the securities placement laws. In fulfilling this role, Williams was earning his regular fees. He was

not an insider, and was not an investor in any of Mr. Southwick's or VesCor's operations.

While the Receiver places great emphasis on the fact that Williams had knowledge of Southwick's past compliance problems, there is no evidence that Williams had particular knowledge that the 2001 to 2004 securities offerings were based on an insolvent operation or fraud. With regard to the issue of insolvency, it was well established that Williams' expertise was in the area of securities compliance issues. He has never worked in the areas of creditors rights, insolvency or bankruptcy law. Similarly, he was not trained in accounting, and when his work required financial information, he reasonably relied on the information provided by professional and independent accountants. With regard to fraud, the evidence showed that there was nothing to indicate fraud other than the prior compliance problems, the most egregious of which were outside the relevant time frame. With respect to the projects he worked on between 2001 and 2004, the evidence showed that Williams had reason to believe that these were legitimate projects as he either physically visited the properties in question or saw documentation supporting and authenticating the various projects. Moreover, Williams' job was to help VesCor *comply* with the securities laws, not to assist in dispensing misrepresentations.

Additionally, an important consideration for the court is the fact that the regulatory and investigative agencies specifically designed to enforce the securities laws were not discovering either VesCor's insolvency or fraud. The evidence showed that the Utah Securities Commission, who was actively investigating VesCor and reviewing VesCor's operations "under a microscope," repeatedly declined to shut down VesCor's operations. Yet now, with the benefit of hindsight, the Receiver seeks to put the burden of uncovering the insolvency and fraud on

Williams, and claim that somehow Williams, a non-accountant, who had knowledge of only a portion of VesCor's total operations, and who reasonably relied on the financial documentation provided by independent accountants in performing his job, should have known or could have discovered the fraud or insolvency of Southwick's massive scheme.

Here we have a lawyer being a lawyer. This case presents none of the kinds of fraud that were present in <u>Jobin</u>. For example, there is no evidence of too-good-to-be-true interest rates, bounced checks, implausible explanations, and post-dated payment checks. See <u>Jobin</u>, 84 F.3d at 1338. Rather, we have a qualified securities lawyer, doing what he knew how to do, at his regular hourly fee, interacting with other reputable lawyers and independent accountants. Moreover, Williams even went so far as to terminate his relationship with Southwick when he disagreed with a proposed legal strategy. The court finds there is a significant difference between the situation described by the evidence in this case and a person who seeks to get rich by participating, such as an investor, or even a service provider, such as a lawyer, who is paid an inflated amount.

The Receiver seeks too much here. In an effort to repay the victims of the VesCor Ponzi scheme, he may well be creating more victims. Williams did competent legal work at a reasonable rate and he did it in good faith. Williams was, and is, entitled to his fee.

In sum, the court concludes as a matter of law that the Receiver has succeeded in establishing that the VesCor affiliated companies were part of a Ponzi scheme rendering the payments to Williams fraudulent transfers. However, the court also concludes, as a matter of law, that Williams has satisfied his burden of proving an affirmative defense to these otherwise

fraudulent transfers – that he received the payments in good faith and for a reasonably equivalent value.

      IT IS SO ORDERED.

      DATED this 11th day of March, 2011.

                                    Dee Benson
                                    United States District Judge